## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| CARLTON BANKS, | ) | Case No. 1:24-cv-818 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jonathan D. Greenberg |
| PNC BANK N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff Carlton Banks brings this suit against Defendant PNC Bank, alleging breach of contract and civil rights violations. Defendant moves to dismiss the complaint under Rule 12(b)(6). For the following reasons, the Court **GRANTS** the motion.

## STATEMENT OF FACTS

On Defendant's motion to dismiss, the complaint alleges the following facts, which the Court accepts as true and construes in the light most favorable to Plaintiff, as it must in the present procedural posture.

### A.    The Property and the Short Sale

Mr. Banks is the successor-in-interest to a mortgage on property located at 13913 Svec Avenue in Cleveland, Ohio. (ECF No. 16, ¶¶ 1 & 3, PageID #364.) Defendant PNC Bank holds the first mortgage on the property. (*Id.*, ¶ 2.) In 2018, the City of Cleveland's Building Department issued code violations for the property, and Mr. Banks faced misdemeanor charges for these violations. (ECF No. 16-1,

PageID #371.)  PNC was aware of these violations and their potential penalties.  (ECF No. 16, ¶ 14, PageID #365.)  Additionally, as of August 2023, the property was the subject of condemnation proceedings, "sat vacant for years," and lacked plumbing, electricity, heating, and air conditioning.  (ECF No. 16-1, PageID #374, #376 & #387.)

To support his claims, Mr. Banks attached roughly seventy pages of "emails and other communications" to his complaint.  (ECF No. 16, ¶ 6, PageID #365.)  None of these documents include Mr. Banks directly.  After all, he alleges that he is the successor-in-interest to the mortgage.  (*Id.*, ¶ 3, PageID #364.)  But they do not identify the relationship between Mr. Banks and many of the email participants.  Still, Mr. Banks claims that these email communications culminated in a settlement agreement and establish the facts that lead to his claims.  (*Id.*, ¶ 6, PageID #365.)

Between July 28 and August 8, 2023, Catherine Cain—a real estate agent contracting with Velocity REO—sought to photograph the property.  (ECF No. 16-1, PageID #383–84.)  The allegations do not specify Cain's relationship to either party or allege whether she actually took photographs of the property.  By August 8, Cain or Velocity REO allegedly reported a broker price opinion to PNC Bank on the property for $45,000 "as-is," plus $28,000 in repairs, for a total of $73,000 after repairs.  (*Id.*, PageID #375.)  Cain claimed that she did not create the opinion, stating:  "All I do is submit the photos."  (*Id.*, PageID #374.)

Representatives of the Abandoned Homes Project told Cain by email that the broker price opinion overvalued the property and underestimated its repair costs.  (*Id.*, PageID #375.)  The Abandoned Homes Project's relationship with Mr. Banks is

2

not alleged in the second amended complaint or made clear in the attachments to it. Further, Kevin Ra—chairman of Parcel Revenue—claimed the property was listed at $45,000 for "several months" and reported that he received no offers over half that price. (ECF No. 16, ¶¶ 15–17, PageID #366.) But the record does not make clear Ra's relationship with Mr. Banks either.

On August 11, 2023, Ra sent an email requesting approval from Gellie Henegar, a client relations officer at PNC Bank, for a $10,000 short sale for the property, on which PNC Bank held the mortgage. (ECF No. 16-1, PageID #373.) The second amended complaint does not contain any further details on this offer, such as the identity of the potential buyer. Ra's use of the term "short sale" suggests that the balance remaining on the mortgage exceeded $10,000, but the second amended complaint does not specify the outstanding principal on the mortgage. Further, this term suggests that PNC Bank's acceptance of the offer would satisfy the mortgage and eliminate the lien, but the communications attached to the second amended complaint do not confirm this inference. Ra believed that an employee of his relayed PNC Bank's approval of the sale on August 11, 2023. (*Id.*, PageID #388.) However, in a subsequent email to Ra, that Henegar at PNC Bank did not respond when he follow up with her to confirm the short sale. (*Id.*, PageID #388.)

Later, in an email on August 14, 2023, Henagar asked Ra if the short sale buyer remained interested. (*Id.*, PageID #377.) In response, Ra questioned whether PNC Bank had "leverage…to dictate decisions" and stated that "we will tear down this house" or ask the city to tear it down if PNC Bank did not approve the offer. (*Id.*,

3

PageID #381.)  Also, Ra claimed that PNC Bank's behavior throughout their dealings on the property was racially discriminatory because its "tactics disproportionately impact black and brown communities." (*Id.*, PageID #389.).  Finally, Ra told Henegar at PNC Bank, "If I were you, I'd get me that approval letter [for the short sale] ASAP." (*Id.*, PageID #381.)

### B.      Further Disagreement and Alleged Agreement

On August 18, 2023, Henegar informed Ra that PNC Bank required more documents, including a sales contract with wet (not electronic) signatures, a HUD-1 settlement statement, and articles of incorporation for buyers which were limited liability companies, before PNC Bank would approve a short sale. (*Id.*, PageID #398.) On August 19, 2023, Ra claimed that these documents were previously faxed to PNC Bank. (*Id.*, PageID #403.)  Nonetheless, on August 21, 2023, Henegar replied that PNC Bank had not received the documents. (*Id.*, PageID #414.)  On August 30, 2023, when Henegar at PNC Bank followed up asking whether Ra would submit the documents, he replied that he would speak with his attorney within two weeks and that Henegar could "reach back out after that." (*Id.*, PageID #420–21.)  In this correspondence, Ra did say whether he had a valid agreement for a short sale.  Nor does the record otherwise confirm that he did.

From these events and communications, Mr. Banks alleges that he had a settlement agreement with PNC Bank to settle the mortgage. (ECF No. 16, ¶ 6, PageID #365.)  Although the second amended complaint is not entirely clear on the point, the Court understands that it alleges an agreement to settle the outstanding mortgage at the short sale price of $10,000.  Further, Plaintiff alleges that the

4

agreement required a licensed appraisal of the property and that PNC Bank used an automated valuation model in violation of the agreement's appraisal provision. (*Id.*, ¶¶ 7–9, PageID #365.). As a result, the second amended complaint alleges that the appraisal significantly overvalued the property, resulting in outstanding mortgage debt in excess of the property's worth. (*Id.*, ¶ 12.) Specifically, Plaintiff alleges that PNC Bank "push[ed] the Plaintiff to pay an inflated amount to settle the outstanding mortgage debt" based on the automated valuation model and that PNC Bank "knew [the amount] was far more than the Property was worth." (*Id.*, ¶ 12, PageID #365.)

Plaintiff alleges that automated valuation models are both inaccurate and biased, particularly against African Americans owners like Mr. Banks and in predominantly African American communities like the one where the property is located. (*Id.*, ¶¶ 10–13, PageID #365.) Further, he alleges that PNC Bank knew of these reported problems with automated valuation models during the events at issue. (*Id.*, ¶¶ 10–11, PageID #365.)

## STATEMENT OF THE CASE

Plaintiff first filed suit in April 2024 in State court asserting claims for breach of contract and breach of the implied duty of good faith and fair dealing. (ECF No. 1-1.) Defendant timely removed the action. After conducting an independent review, the Court determined it lacked subject matter jurisdiction because the case did not satisfy the jurisdictional amount in controversy for diversity jurisdiction. (ECF No. 6, PageID #62.) On remand, Plaintiff filed an amended complaint that

added federal causes of action. (ECF No. 9, PageID #67.)  Then, Defendant timely removed in October 2024.  (ECF No. 9.)

Eventually, with leave of court, Plaintiff filed a second amended complaint. (ECF No. 16.)  The second amended complaint asserts claims for breach of contract (Count One) and violation of federal civil rights laws, specifically 42 U.S.C. §§ 1981 and 1982 (Count Two).  (*Id.*, ¶¶ 18–36, PageID #366–67.)  Defendant moves to dismiss.  (ECF No. 19.)  Fundamentally, and in short, Plaintiff asserts these claims based on PNC Bank's alleged failure to complete a short sale that would satisfy a mortgage because the appraisal of the property subject to the mortgage gave it too high a value.

## ANALYSIS

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a cause of action.  *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)).  A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability."  *Twombly*, 550 U.S. at 555, 557 n.5.

6

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]" *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'"). Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

## I.  Breach of Contract

Plaintiff alleges that PNC Bank relied on automated valuation models, instead of one by a licensed appraisal, in violation of the settlement agreement. (ECF No. 16, ¶¶ 7–9 & 18–30, PageID#365 & 366–67.) To establish a claim for breach of contract under Ohio law, a plaintiff must prove: (1) the parties entered into a contract; (2) the

plaintiff performed; (3) the defendant breached a contractual duty; and (4) the breach resulted in damage or loss to the plaintiff. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012).

### I.A.1. Contract Formation

To form a contract, Ohio law requires "offer, acceptance, contractual capacity, consideration, manifestation of mutual assent, and legality of object and consideration." *Bruzzese v. Chesapeake Expl., LLC*, 998 F. Supp. 2d 663, 669 (S.D. Ohio 2014) (citing *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16). Additionally, there must be a meeting of the minds between the parties who consent to essential terms, which are definite and certain. *Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Relations*, 61 Ohio St. 3d 366, 369, 575 N.E.2d 134; *Bruzzese*, 998 F. Supp. 2d at 670. A contract's essential terms include "the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *GEM Indus., Inc. v. Sun Tr. Bank*, 700 F. Supp. 2d 915, 921 (N.D. Ohio 2010) (citing *Alligood v. Procter & Gamble Co.,* 72 Ohio App.3d 309, 311, 594 N.E.2d 668, 669 (1991)).

All parties must "manifest an intention to be bound by" the contract or agreement. *Bruzzese*, 998 F. Supp. 2d at 673; *Reedy v. The Cincinnati Bengals, Inc.,* 143 Ohio App. 3d 516, 521, 758 N.E.2d 678, 682 (2001). Usually, this manifestation comes in the form of an offer and acceptance. *McSweeney v. Jackson*, 117, Ohio App. 3d 623, 691 N.E.2d 303, 308 (1996). But it may result from each party making a promise or beginning to perform. *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013). Unless a statute or the contract

8

itself requires otherwise, the parties may manifest their mutual assent through written or spoken words, or by actions or omissions, *id.*, including by email, *North Side Bank & Tr. Co. v. Trinity Aviation, LLC*, 2020-Ohio-1470, 153 N.E.3d 889, ¶ 18 (Ohio Ct. App. 2020).

The burden of establishing a contract rests on the party asserting its existence. *Guardian Alarm Co. v. Portentoso*, 196 Ohio App. 3d 313, 2011-Ohio-5443, 963 N.E.2d 225, ¶ 17 (citation omitted). Acceptance of an offer creates a binding contract. *MTD Products Inc. v. Am. Honda Motor Co., Inc.*, 744 F. Supp. 3d 812, 825 (N.D. Ohio 2024). However, if a party communicates that "something remains to be done to establish [a] contractual relationship, no contract has been made." *Id.* Further, acceptance has not occurred if the offeree places additional conditions on the offeror. *Ridge Stone Builders & Developers, Ltd. v. Gribbin*, 2003-Ohio-5188, ¶ 25. Such conditions or the proposal of additional terms not in the original offer constitutes a counteroffer that "reject[s] and extinguish[es] all previous offers." *In re Halishak*, 324 B.R. 641, 644 (Bankr. N.D. Ohio 2005).

### I.A.2. The Settlement Agreement

Plaintiff alleges that he and Defendant entered into a valid settlement agreement through emails and other communications as evidenced through emails and other documents attached to the second amended complaint. (ECF No. 16, ¶ 6, PageID #365.) Even construing the second amended complaint including the documents attached to it in Plaintiff's favor, Plaintiff fails to plead as a matter of law any enforceable contract between the partis.

It is black-letter law that a contract requires offer and acceptance.  *Bruzzese*, 998 F. Supp. 2d at 669.  The only offer at issue might be Ra's request on August 11, 2023 that PNC Bank approve a $10,000 short sale.  (ECF No. 16-1, PageID #373.) This email suggests that that assent to the offer would conclude the transaction and form a contract containing the essential terms of the transaction with sufficient definiteness (at least at the pleading stage).  But the communications attached to the second amended complaint demonstrate that PNC Bank did *not* accept the offer.  On August 14, 2023, through Henegar, it asked Ra if the proposed buyer remained interested.  (*Id.*, PageID #389.)  Ra responded with confusion and frustration, supporting a determination that the parties had no contract.  (*Id.*)  Then, when Ra followed up with an employee of his, that employee specifically told Ra that PNC Bank did not accept the offer.  (*Id.*)  At the pleading stage, as a matter of law, these facts and circumstances foreclose the formation of a contract between the parties.

Further communications confirm this determination.  On August 18, 2023, Henegar rejected the short sale offer.  (*Id.*, PageID #403.)  Her email stated that PNC Bank required additional documents before it would approve any such transaction. Such a requirement sets conditions on PNC Bank's approval and introduces terms not in the original offer, creating a counteroffer under Ohio law.  That counteroffer rejected and extinguished Ra's original offer.  The second amended complaint does not allege any other facts showing that there might be an enforceable contract.

Even if the parties somehow formed a contract, Plaintiff's second amended complaint suffers from another fatal flaw.  None of the communications between Ra

10

and Henegar (or related to the transaction) include an appraisal provision. A core allegation in the second amended complaint is that the settlement agreement required an appraisal that does not rely on an automated valuation model. (ECF No. 16, ¶¶ 6–9, PageID #365.) No such term appears in the documents included in the pleadings. Indeed, the terms "appraisal" and "AVM" (and its variants) do not appear in them. Ra and the Abandoned Homes Project allege that Cain created a broker price opinion for the property (ECF No. 16-1, PageID #375), but that is as far as the allegations go. Taking these facts as true, nothing suggests that the broker price opinion resulted for an automated valuation model. Under Rule 8, these allegations in the second amended complaint are simply conclusory and thread-bare. Nothing in these communications or the pleadings suggests, even inferentially, that the parties agreed to a contract term for an appraisal that did not use an automated valuation model.

As a matter of law, Plaintiff cannot carry his burden of establish a contract between the parties. The pleadings belie rather than support Plaintiff's claims and do not suffice to state a claim under basic Rule 8 principles. *Iqbal*, 556 U.S. at 678.

## II. Discrimination Claims

Plaintiff claims discrimination under 42 U.S.C. §§ 1981 and 1982. (ECF No. 16, ¶¶ 31–36, PageID #367.) Specifically, Plaintiff claims that "PNC's actions constitute the intent to discriminate against Plaintiff on the basis of race." (*Id.*, ¶ 33, PageID #367.) Further, he points to PNC Bank's "interfere[nce] with Plaintiff's right to make and enforce contracts and his right to convey real property without discrimination." (*Id.*, ¶ 34, PageID #367.)

11

Section 1981 prohibits intentional racial discrimination by private and public actors in the making and enforcing of contracts. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 867-868 (6th Cir. 2001). The statute provides that all citizens "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Further, the statute defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(b). To bring a claim under Section 1981, a plaintiff must show that (1) the plaintiff belonged to a protected class; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in the statute *Inner City Contracting, LLC v. Charter Twp. of Northville, Michigan*, 87 F.4th 743, 755 (6th Cir. 2023) (citing *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006)). Intentional discrimination can be shown either through direct evidence or circumstantial evidence that would support an inference of discrimination. *Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).

Section 1982 states: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "Because § 1982 was also first enacted as part of the Civil Rights Act of 1866 and uses nearly identical language as § 1981," courts interpret these claims in tandem. *Comcast Corp. v. National Ass'n of African American-Owned Media*, 589 U.S. 327, 336 (2020) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 447 (2008)).

12

"Broad and conclusory allegations of discrimination cannot be the basis of a complaint and a plaintiff must state allegations that plausibly give rise to the inference that a defendant acted as the plaintiff claims." *HDC, LLC v. City of Ann Arbor,* 675 F.3d 608, 614 (6th Cir.2012). "Although the plaintiff may survive a motion to dismiss without pleading a *prima facie* case of discrimination, the complaint must nevertheless allege sufficient 'factual content' from which a court could 'draw the reasonable inference' of racial discrimination." *James v. Hampton*, 592 F. App'x 449, 461 (6th Cir. 2015) (quoting *Iqbal,* 556 U.S. at 678). On this score, Plaintiff's allegations fail.

Construed in Plaintiff's favor, the pleadings establish only that Mr. Banks belongs to a protected class. Beyond that, the second amended complaint alleges that PNC Bank used an automated valuation model systemically biased against homes in predominantly African-American communities. Even if true, that model resulted in a valuation that was allegedly too high—not too low—which forestalled a short sale. Without more, these statutes do not provide a vehicle for a person to repudiate a mortgage at a bargain-basement price. And Plaintiff's conclusory allegations of discrimination fail to show he is entitled to relief. *See HDC, LLC*, 675 F.3d at 613.

Additionally, in opposing dismissal of his discrimination claim, Plaintiff fails to develop an argument at all, resulting in its waiver. This failure extends to arguing that the statutes permit claims based on a disproportionate impact theory. Nothing else in the pleadings suggests, directly or by inference, that PNC Bank had an intent to discriminate against Mr. Banks on the basis of race. Accordingly, the second

13

amended complaint and its attached emails do not allow the Court to "draw the reasonable inference of racial discrimination" under Sections 1981 and 1982. *James*, 592 F. App'x at 461.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion to dismiss the second amended complaint (ECF No. 19).

**SO ORDERED.**

Dated:  July 2, 2025

J. Philip Calabrese
United States District Judge
Northern District of Ohio